UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

* * *

NADIA WALKER, an individual,;
KATHLEEN VINCENT, an individual;
DAWN DUNCAN, an individual; and
MELISSA MESH, an individual,

        Plaintiffs,

    v.

VENETIAN CASINO RESORT, LLC, a
Domestic Limited Liability Company; DOES
and ROES 1-100, inclusive,

        Defendants.

02:10-CV-00195-LRH-VCF

ORDER

Before the court are five motions for summary adjudication. Plaintiffs Nadia Walker, Kathleen Vincent, Dawn Duncan, and Melissa Mesh have moved for partial summary judgment on their claims for negligent training and supervision and breach of contract (#102[1] and #107, respectively). Defendant Venetian Casino Resort has moved for summary judgment on all of Plaintiffs claims in three separate motions (#109, #110, #111). The parties have both responded and replied to each motion (Plaintiffs' responses: #138, #133, #137; Plaintiffs' replies: #151, #150; Defendant's responses: #144, #136; Defendant's replies: #153, #156, #152).

---

[1] Refers to the court's docket number.

1    I.    Facts and Procedural History

2          Plaintiffs Nadia Walker, Kathleen Vincent, Dawn Duncan, and Melissa Mesh were hired as

3    cocktail servers at the Venetian Casino Resort ("Venetian") when it opened in 1999. (Plaintiffs'

4    First Amended Complaint (FAC) (#50), ¶ 9.) (This earned them the title of "Founder," which

5    occasionally appears in language quoted from the parties' exhibits.) Venetian initially adopted a

6    "no rotation" policy for its servers: servers would bid for "stations" on the casino floor according to

7    a performance-based score. (Id. at ¶ 13.) "Pit" stations–areas of the casino including table

8    games–were more popular because they were more lucrative. (Id. at ¶ 23.)

9          Three years after Venetian hired Plaintiffs, Venetian abandoned the performance-based

10   bidding system for a seniority-based system. (Defendant's Motion for Summary Judgment (MSJ)

11   (#111), 18:20-22.) Over time, this had the effect of giving Plaintiffs their choice of stations and

12   shifts. They chose the best of both. (FAC (#50) at ¶ 22.)

13         In 2008, as Nevada casinos suffered historic losses, Venetian announced it would move all

14   its servers to a rotation schedule. (Defendant's MSJ (#111) at Ex. T.) Under a rotation schedule,

15   Plaintiffs would lose their lucrative stations. The rotation announcement also coincided with the

16   promotion of Sebastien Sylvestri and Daniel Lydia from within the Beverage Department–the

17   department overseeing cocktail servers. (Plaintiffs' Opposition (#138), Ex. 4, ¶ 9.) Before and after

18   the announcement, Lydia was heard talking about his plan to "fuck the Founders" by depriving

19   them of their permanent stations. (Id.) Some who heard him inferred that Lydia and Sylvestri

20   wanted the older cocktail servers out. (Id. at Ex. 5, p. 41:15-17.)

21         Following the move to a rotation schedule, things deteriorated for Plaintiffs. Plaintiff

22   Walker challenged the rotation decision as discriminatory in early 2009. (Id. at Ex. 35.)

23   Subsequently, her time-off requests were denied, she received the lowest performance evaluation of

24   her Venetian career, Sylvestri disciplined her for insubordination, and she was ultimately

25   terminated for the same reason. (Plaintiffs' Opposition (#137), Ex. 16.) Plaintiff Vincent injured

26                                                      2

herself while on rotation in an unfamiliar part of the casino. She took disability leave; subsequently, she was terminated. (*Id.* at Ex. 19.) Plaintiff Duncan was also denied time off. She experienced attendance problems; subsequently, she was terminated. (*Id.* at Ex. 17.) And Plaintiff Mesh continues working at the Venetian on less desirable shifts. (*Id.* at Ex. 18.)

Plaintiffs allege five distinct types of claims. First, Plaintiffs allege that the 2008 rotation and subsequent adverse events are the result of age discrimination. Second, they allege that Venetian retaliated against them when they challenged this discrimination. Third, Plaintiffs claim that Venetian breached its contract with them when it moved to the rotation schedule. Fourth, Plaintiffs argue that Venetian was negligent in training and supervising Sylvestri and Lydia. Fifth, Plaintiff Vincent alleges that Venetian discriminated against her on the basis of her disability.

The court considers each claim in turn.[2]

## II.   Legal Standard

Summary judgment is appropriate only when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).  In assessing a motion for summary judgment, the evidence, together with all inferences that can reasonably be drawn therefrom, must be read in the light most favorable to the party opposing the motion.  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *County of Tuolumne v. Sonora Cmty. Hosp.*, 236 F.3d 1148, 1154 (9th Cir. 2001).

The moving party bears the burden of informing the court of the basis for its motion, along with evidence showing the absence of any genuine issue of material fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  On those issues for which it bears the burden of proof, the moving party must make a showing that is "sufficient for the court to hold that no reasonable trier of fact could

---

[2] To the extent Plaintiffs have mixed requests for evidence spoliation sanctions in with their claims, these requests are denied as moot in light of the disposition below.

3

1   find other than for the moving party." *Calderone v. United States*, 799 F.2d 254, 259 (6th Cir.

2   1986); *see also Idema v. Dreamworks, Inc.*, 162 F. Supp. 2d 1129, 1141 (C.D. Cal. 2001).

3        To successfully rebut a motion for summary judgment, the non-moving party must point to

4   facts supported by the record which demonstrate a genuine issue of material fact. *Reese v.*

5   *Jefferson Sch. Dist. No. 14J*, 208 F.3d 736 (9th Cir. 2000). A "material fact" is a fact "that might

6   affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S.

7   242, 248 (1986). Where reasonable minds could differ on the material facts at issue, summary

8   judgment is not appropriate. *See v. Durang*, 711 F.2d 141, 143 (9th Cir. 1983). A dispute

9   regarding a material fact is considered genuine "if the evidence is such that a reasonable jury could

10  return a verdict for the nonmoving party." *Liberty Lobby*, 477 U.S. at 248. The mere existence of a

11  scintilla of evidence in support of the plaintiff's position will be insufficient to establish a genuine

12  dispute; there must be evidence on which the jury could reasonably find for the plaintiff. *See id.* at

13  252. Finally, where–as here–both sides have moved for summary judgment, the court must consider

14  evidence submitted in support of both motions before ruling on either motion. *See Fair Housing*

15  *Council of Riverside County, Inc. v. Riverside Two*, 249 F.3d 1132, 1136 (9th Cir. 2001).

16  **III.   Discussion**

17      **A. ADEA Disparate Treatment and Disparate Impact**

18       Plaintiffs allege that Venetian intentionally discriminated against them in violation of the

19  Age Discrimination in Employment Act (ADEA). *See* 29 U.S.C. § 623(a) (making it unlawful for

20  an employer to take adverse action against an employee "because of such individual's age"). In

21  particular, Plaintiffs claim that Venetian discriminated on the basis of age with respect to positions

22  in the station bidding order, days off, disciplinary action, the distribution of uniforms, work

23  assignments, and benefits. (Plaintiffs' Opposition (#138), p. 6-12.) Venetian denies any

24  discrimination.

25       Intentional discrimination under the ADEA is legally euphemized as "disparate treatment."

26

1   An ADEA plaintiff may establish disparate-treatment discrimination through direct or

2   circumstantial evidence. *Sheppard v. David Evans & Associates*, 2012 WL 3983909, at *2 (9th Cir.

3   Sept. 12, 2012). In this Circuit, the *McDonnell Douglas* burden-shifting framework applies to

4   circumstantial evidence of age discrimination at summary judgment (though not at trial). *Shelley v.*

5   *Green*, 666 F.3d 599, 607 (9th Cir. 2012). Under *McDonnell Douglas*, a plaintiff employee must

6   first establish a prima facie case of discrimination. This exists where the plaintiff produces

7   evidence (1) that she is 40 years old or older, (2) that she was qualified for her position, (3) that

8   despite being qualified she was adversely effected as an employee, and (4) that someone younger

9   (but otherwise similarly situated) was treated more favorably. *See McDonnell Douglas Corp. v.*

10  *Green*, 411 U.S. 792, 802 (1973); *see also Coleman v. Quaker Oats Co.*, 232 F.3d 1271, 1281 (9th

11  Cir. 2000).

12      If the plaintiff states a prima facie case, she has created a rebuttable presumption of

13  discriminatory treatment. The employer may rebut this presumption by producing evidence of a

14  non-discriminatory reason for its actions. This evidence "explodes" the presumption of unlawful

15  discrimination, and at summary judgment the plaintiff must respond with evidence sufficient to

16  raise a genuine issue of material fact as to whether the employer's evidence is pretextual. *Keisling*

17  *v. SER-Jobs for Progress, Inc.*, 19 F.3d 755, 761 (1st Cir. 1994). *See also Coleman*, 232 F.3d at

18  1282.

19      Venetian first objects to Plaintiffs' claims by asserting they are time-barred. To the extent

20  Plaintiffs Duncan, Mesh, and Vincent's claims are based on the 2008 move to a rotation schedule,

21  the court agrees. "A discriminatory practice, though it may extend over and involve a series of

22  related acts, remains divisible into a set of discrete acts, legal action on the basis of each of which

23  must be brought within the statutory limitations period." *Lyons v. England*, 307 F.3d 1092, 1108

24  (9th Cir. 2002). The allegation that these discrete acts stem from a discriminatory policy does not

25  extend the statutory limitations period. *See id.* at 1107.

26

1    Here, that period is 300 days prior to the filing of the Equal Employment Opportunity

2   Commission (EEOC) complaint. *See* 29 U.S.C. § 626(d)(1)(B) (setting out 300-day period for

3   states that have laws prohibiting discrimination on the basis of age, of which Nevada is one (N.R.S.

4   § 233.160)). Plaintiff Duncan filed her EEOC complaint on July 14, 2010. (Defendant's MSJ

5   (#109), Ex. K.) Plaintiff Mesh filed her EEOC complaint on September 2, 2010. (*Id.* at Ex. M.)

6   Plaintiff Vincent filed her EEOC complaint on July 20, 2010. (*Id.* at Ex. L.) Therefore, to the extent

7   these Plaintiffs' claims rely on events 301 days before these dates (including the December 2008

8   rotation decision), these claims are time-barred. On the other hand, Plaintiff Walker filed her first

9   complaint on January 30, 2009. (Plaintiffs' Opposition (#138) at Ex. 35.) Thus, Plaintiff Walker's

10   disparate treatment claim includes the December 2008 rotation decision.

11    The parties do not dispute that Plaintiffs have established a prima facie case. Instead,

12   Venetian offers non-discriminatory reasons for its actions–particularly for the 2008 move to a

13   rotation schedule–and Plaintiffs argue that these reasons are pretextual. Venetian relies primarily on

14   an economic argument to justify the switch to the rotation schedule. And the economic facts are

15   stark: "On October 2, 2007 [Venetian's] stock traded at $144.56 per share . . . only to bottom out at

16   $1.42 a share on March 5, 2009, a loss of approximately 99%." (Defendant's MSJ (#111), 7:16-17.)

17   In response to this new economic reality, Venetian's parent corporation laid off around 750 Las

18   Vegas employees, and Venetian's Beverage Department reduced inventory, revised complimentary

19   drink procedures, and took other cost-saving measures. (*Id.* at Ex. Q.)

20    In Venetian's telling, the move to a rotation schedule was one of these measures. As Pete

21   Boyd, the Venetian's then-Vice President of Food and Beverage, wrote in an email, the drop off in

22   business meant that Venetian needed to "reduce staffing," and one way to accomplish this was by

23   including Plaintiffs in a rotation schedule. (*Id.* at Ex. T.) This allowed Venetian to enlarge

24   Plaintiffs' former stations as well as to achieve "maximum flexibility" in stationing its servers. (*Id.*)

25   Venetian arrived at this decision after several beverage department manages and executives met,

26                                                    6

1   including Executive Director of Food and Beverage Sebastien Sylvestri. (*Id.* at Ex. Q.)

2        Around the time of the rotation implementation, Beverage Department manager Daniel

3   Lydia expressed an intention to "fuck the Founders" with the rotation schedule. (Plaintiffs'

4   Opposition (#138) at Ex. 4, ¶ 9 and Ex. 5, p. 41:15-17.) For example, former Beverage Department

5   manager Susan Nutton-Carre–terminated by Venetian in September 2008–explained that as soon as

6   Sylvestri assumed the position of Executive Director of Food and Beverage in July 2008, "he

7   appeared to team with Mr. Lydia to rid the Beverage Department of the group of 'Founders' in the

8   cocktail department." (*Id.* at Ex. 4, ¶ 9.) She remembers Lydia saying "fuck those old fat bitches."

9   (*Id.*) She recalls that Sylvestri "encourag[ed]" Lydia. (*Id.*)

10        Heather Geist, the Beverage Department assistant manager responsible for terminating

11   Plaintiff Walker, agrees with Nutton-Carre's assessment. Around the time of the implementation of

12   the rotation, Geist heard Lydia wonder, "Let's see how many of those fat old bitches stick around."

13   (*Id.* at Ex. 5, p. 42:1-10.) Regarding his preferences for new hires in the beverage department,

14   Lydia explained that he "wants them young." (*Id.* at Ex 5, p. 43:5.) Another Venetian

15   employee–this time a cocktail server like the plaintiffs–heard Lydia talking with an unknown

16   person two months after the rotation went into effect. Lydia said, "It's so funny I single handedly

17   got those old fat day one girls out of their pits, and now to watch them trucking through slots." (*Id.*

18   at Ex. 6.)

19        These comments raise a genuine issue of material fact as to the reasons Venetian

20   implemented the 2008 rotation. For example, Venetian claims that Lydia was not the decision-

21   maker on the 2008 rotation, and "stray remarks by non-decision makers are insufficient to establish

22   discrimination." *See Mondero v. Salt River Project*, 400 F.3d 1207, 1213 (9th Cir. 2003). However,

23   these remarks may "bear a more ominous significance" if tied to the adverse action taken against

24   the employee. *Carlton v. Mystic Transportation, Inc.*, 202 F.3d 129, 136 (2d Cir. 2000). Here,

25   Lydia himself raises this ominous specter when he says that he "single handedly got those old fat

26                           7

1   day one girls out of their pits." (Plaintiffs' Opposition (#138) at Ex. 6.) In order to determine

2   whether Lydia is or is not a decision-maker with respect to the 2008 rotation, the court would have

3   to make credibility judgments. That is the jury's province. *See Liberty Lobby*, 477 U.S. at 255.

4          Though the rotation decision is not actionable for all but one plaintiff, the circumstances of

5   that decision may be "background evidence" in support of Plaintiffs' timely claims. *See National*

6   *Railroad Passenger Corp. v. Morgan*, 536 U.S. 101, 112 (2002). Plaintiffs Walker, Duncan, and

7   Mesh claim that they were denied time off–despite the fact that time off was awarded by seniority,

8   of which they had plenty–while younger servers were not. (Plaintiffs' Opposition (#138) at Ex. 17,

9   p. 190:10-196:13 (Walker); Ex. 20 (Duncan); Ex. 15, p. WAPEGR005570 (Mesh).) Venetian

10  persuasively explains this pattern by noting that the younger servers submitted their requests earlier.

11  Such an explanation would be sufficient to counter Plaintiffs if Venetian always awarded time off

12  on a first-come, first-served basis–but that is not the case. (*See id.* at Ex. 18 (explaining how

13  Plaintiff Walker unsuccessfully attempted to get time off on both a first-come, first-served basis

14  and a seniority basis). Nor does Venetian contend Plaintiffs' claim that they were awarded fewer

15  days off in aggregate than younger servers. Reasonable minds could differ on the "legitimate

16  inferences" to be drawn from these facts. *Liberty Lobby*, 477 U.S. at 255.

17         Plaintiff Walker also alleges that Venetian discriminated against older servers in the

18  imposition of discipline. Plaintiff Walker had her disciplinary record mistakenly augmented. When

19  Lydia attempted to secure sanctions against Walker based on this mistaken record, a Human

20  Resources employee resisted. Lydia asked the employee, "Can't you just play along?" (Plaintiffs'

21  Opposition (#138) at Ex. 21.) Venetian calls this question "likely in jest;" Plaintiff Walker calls it

22  vindication. (*See* Defendant's Opposition (#144) at 20.) A jury should decide whom to believe.

23         On the other hand, Plaintiff Vincent has not made any timely claims of disparate treatment.

24  Plaintiff Vincent's adverse employment action revolves around the discipline she received for

25  peeling the labels off of beer bottles. (Plaintiffs' Opposition (#137) at Ex. 30, p. 86:18-19.)

26

1  However, this discipline occurred in 2008, after Plaintiff Vincent's 300 day limitation period (as

2  determined by her EEOC complaint filing date) had run. Therefore, Venetian's Motion for

3  Summary Judgment with respect to Plaintiff Vincent's disparate treatment claim is granted.[3] There

4  exist genuine issues of material fact with respect to the remaining plaintiffs' non-time-barred

5  disparate treatment claims. Accordingly, Venetian's Motion is denied with respect to these claims.[4]

6       Finally, Plaintiffs have alleged an ADEA disparate impact claim. To make out a prima facie

7  case of disparate impact discrimination, the employee must prove that a facially neutral

8  employment practice had a discriminatory impact on older workers. *Katz v. Regents of University*

9  *of California*, 229 F.3d 831, 836 (9th Cir. 2000). If the employee makes such a case, then the

10  employer may avoid liability by showing the policy was based on a reasonable factor other than

11  age. *Smith v. City of Jackson, Miss.*, 544 U.S. 228, 239 (2005). While statistical evidence may be

12  probative in establishing a discriminatory impact, the statistical sample size must be large enough

13  to discern a pattern of discriminatory decisions. *Sorosky v. Burroughs*, 826 F.2d 794, 804 (9th Cir.

14  1987).

15       Here, the facially neutral policy at issue is Venetian's "undisciplined system of subjective

16  decision making." (Plaintiffs' Opposition (#137) at 1:22-23.) However, Plaintiffs have not set forth

17  adequate statistical evidence to show a disparate impact on older workers. In *Sorosky*, the Ninth

18  

19  _____

19       [3]Plaintiff Vincent also argues that younger disabled employees were accommodated while she
20  was not. The relevance of accommodation is addressed in the discussion of Plaintiff Vincent's ADA
     claim, below.

21       [4] Plaintiffs have also not presented any corroborated evidence that Venetian discriminatorily
22  distributed uniforms. Self-serving, uncorroborated testimony does not create a genuine issue of material
     fact. *Villiarimo v. Aloha Island Air, Inc.*, 281 F.3d 1054, 1061 (9th Cir. 2002) (quoting *Johnson v.*
23  *Washington Metropolitan Transit Authortiy*, 883 F.2d 125, 128 (D.C.Cir.1989)). The (non-time-barred)
     evidence of disparate treatment regarding benefits, work assignments, and station bidding order relates
24  only to Plaintiff Walker. Since the court finds that Plaintiff Walker has raised a genuine issue of
     material fact with respect to her disparate treatment claim, it is not necessary to address this evidence
25  here. Where relevant, the court addresses this evidence in its discussion of Plaintiff Walker's retaliation
26  claim, below.

9

1   Circuit confronted a situation in which 17 employees were terminated, 7 of whom were over age

2   40. The court held that–absent evidence of statistical significance and without a larger sample

3   size–this impact was not disparate. 826 F.2d at 804. The 2008 rotation affected 27 servers, 10 of

4   whom were over the age of 40. (Defendant's Reply (#152), 6:4-5.) That is, the rotation affected a

5   *lower* percentage of older workers that did the termination in *Sorosky*.[5] Therefore, Plaintiffs have

6   failed to make a prima facie case of disparate impact discrmination under the ADEA.

7   **B. ADEA Retaliation**

8   　　The ADEA prohibits employer retaliation after an employee has opposed an unlawful

9   employment practice. 29 U.S.C. § 623(d). To establish a claim of retaliation, a plaintiff must prove

10  that (1) she engaged in protected activity, (2) she suffered an adverse employment action, and (3)

11  there was a causal link between the two. *Poland v. Chertoff*, 494 F.3d 1174, 1179 (9th Cir. 2007).

12  "The causal link may be inferred from circumstantial evidence such as the employer's knowledge of

13  the protected activities and the proximity in time between the protected activity and the adverse

14  action." *Dawson v. Entek International*, 630 F.3d 928, 936 (9th Cir. 2011) (citation omitted).

15  Protected activities include company-internal complaints about discrimination. *See Passantino v.*

16  *Johnson & Johnson Consumer Products, Inc.*, 212 F.3d 493, 506-07 (9th Cir. 2000).

17  　　After the plaintiff establishes a prima facie case of unlawful retaliation, the burden then

18  shifts to the defendant employer to offer evidence that the challenged action was taken for

19  legitimate, non-discriminatory reasons. *Dawson*, 630 F.3d at 936 (citation omitted). "Finally, if the

20  employer provides a legitimate explanation for the challenged decision, the plaintiff must show that

21  the defendant's explanation is merely a pretext for impermissible discrimination." *Id.* (citation

22  omitted).

23  　　Here, Plaintiff Duncan opposed Venetian's alleged age discrimination–and therefore

24

25  　　[5] As noted above, the 2008 rotation is relevant only to Plaintiff Walker's ADEA claims because

26  the other Plaintiffs are time-barred from asserting rotation-based claims.

engaged in a protected activity–when she complained to Venetian's Human Resources department about discriminatory treatment. (*See* Plaintiffs' Opposition (#137) at Ex. 17, ¶ 19.) The only non-time-barred claims that Plaintiff Duncan has raised involve (1) discrimination in awarding time off and (2) an unspecified incident with a supervisor. (*Id.* at 39-40.) First, Plaintiff Duncan has not offered any evidence connecting a protected activity with the denial of her time-off requests. While Plaintiff Duncan does allege in several emails to Venetian's Human Resources Department that her time-off requests have been denied discriminatorily, there is no indication that these requests were retaliation for some earlier complaint. (*Id.* at Exs. 36-39.) Therefore, Plaintiff Duncan has failed to meet the causation prong of the prima facie case with respect to Venetian's time-off decisions.

Second, Plaintiff Duncan alleges that a supervisor retaliated against her by a "sudden appearance at the time clock" after she had reported him for discriminatory conduct. (*Id.* at 39.) However, this description is too skeletal to provide a genuine issue of material fact for summary judgment. For example, it is not possible to tell whether Plaintiff Duncan suffered an adverse employment action as a result of her supervisor's actions. Therefore, Plaintiff Duncan has not provided more than a "scintilla of evidence" in support of her position. *Liberty Lobby*, 477 U.S. at 252. Summary judgment is appropriate.[6]

Plaintiff Mesh's retaliation claim stems from her complaint of age discrimination in summer 2009 and the loss of preferred shifts and stations in August 2009. (Plaintiffs' Opposition (#137) at Ex. 40, pp. 114, 126, 131.) But Plaintiff Mesh did not file her EEOC complaint until September 2, 2010. (Defendant's MSJ (#109) at Ex. M.) Therefore, this retaliation claim is time-barred.[7]

Plaintiff Vincent has also not successfully stated a retaliation claim. She alleges that she

---

[6] As Plaintiff Duncan herself notes, she alleges that her termination resulted from age discrimination, not retaliation. (Plaintiffs' Opposition (#137) at 39:1-6.)

[7] To the extent Plaintiff Mesh bases her retaliation claim on the denial of time off, her claim suffers from the same causation defects as Plaintiff Duncan's claim.

complained about age discrimination in the fall of 2008 and was then subject to retaliation in

August of 2009. (Plaintiffs' Opposition (#138) at 44-45.) Plaintiff Vincent's allegation suffers from

a causation problem: the temporal lapse between her protected activity and the adverse employment

action (not being informed of a "rebid" of shifts) is too long to give rise to an inference of

causation. When temporal proximity is the only evidence supporting causation, courts "uniformly

hold that the temporal proximity must be 'very close.'" *Clark County School District v. Breeden*,

532 U.S. 268, 273 (2001); *see also Cornwell v. Electra Central Credit Union*, 439 F.3d 1018, 1036

(9th Cir. 2006) (8-month gap between employee's complaint and his demotion was too great to

support an inference of causation). Nor has Plaintiff Vincent provided evidence that those

responsible for the August 2009 retaliation knew about her earlier complaint. Therefore, Plaintiff

Vincent has not established a prima facie case of retaliation under the ADEA.

On the other hand, Plaintiff Walker's retaliation claim raises a genuine issue of material

fact. Plaintiff Walker's protected activity comes in the form of company-internal and company-

external age discrimination complaints. (*See* Plaintiffs' Opposition (#138) at Ex. 27; Defendant's

MSJ (#109) at Ex. J.) As a result of these complaints, Plaintiff Walker argues, she suffered a

negative performance rating, selective discipline, and ultimately termination. (*See id.* at Ex. 27

(negative performance rating and selective discipline), Defendant's MSJ (#109) at 15:3-4

(termination).) Finally, in each case, Plaintiff Walker has demonstrated a prima facie causal

connection between the protected activity and the adverse employment action. For example, one

week after complaining of age discrimination to a supervisor, Plaintiff Walker received her first

"meets expectations" performance rating from that same supervisor (before, her performance

ratings had all been exemplary). (Plaintiffs' Opposition (#138) at Ex. 40.) Sylvestri allegedly

selected Plaintiff Walker out for discipline about three weeks after she complained about specific

discriminatory acts. (*Id.* at Ex. 42.) During a meeting with Sylvestri regarding this discipline, he

told her that he did not like her "tone"–the "same tone" he had read in Plaintiff Walker's recent

12

1   complaints. (*Id.*) And Plaintiff Walker demonstrates that Lydia was shopping for a pretext to fire

2   her not long before she was fired. (*Id.* at Ex. 5, p. 85.)

3       Venetian argues that Plaintiff Walker's "meets expectations" performance report is not

4   pretextual because it is possible that the supervisor who wrote the report had stricter standards than

5   other supervisors, and Plaintiff Walker had never received an evaluation from this supervisor

6   before. Plaintiff Walker responds by showing that in her 10 years of service at Venetian, she had

7   never received below an "exceeds expectations" rating. (Plaintiffs' Opposition (#138) at Ex. 39.) In

8   addition, Plaintiff Walker provides evidence that the particular supervisor who gave her the less

9   favorable evaluation set her up to fail the night she was terminated. This supervisor overloaded her

10  the night she was terminated by assigning her two work stations instead of one–stations across the

11  casino floor from one another–while allowing other, younger servers to go home. (*Id.* at Ex. 23, ¶¶

12  19-21.) This evidence is sufficient to create a genuine issue of material fact with respect to whether

13  the "meets expectations" performance report was retaliatory.

14      In response to Plaintiff Walker's charge of selective discipline, Venetian argues that the

15  discipline was justified. During what the parties refer to as the "nametag incident," Sylvestri

16  approached Plaintiff Walker and asked why she was not wearing a nametag, contrary to Venetian's

17  policy. Plaintiff Walker explained that her nametag had broken earlier, and she asked Sylvestri why

18  he was not wearing a nametag. Tempers flared, and Plaintiff Walker was disciplined for

19  insubordination. (Plaintiffs' Opposition (#138) at Ex. 27; Defendant's MSJ (#144) at Ex. N.)

20  Plaintiff Walker provides the following evidence of pretext: Sylvestri mentioned her discrimination

21  complaints during the disciplinary meeting; Sylvestri indicated he did not like her "tone," which

22  was the "same tone" he detected in her written complaints; and Sylvestri stated to Plaintiff Walker

23  that he would "get [her]," or "get [her] to sign [the disciplinary form]," after which he winked.

24  (Plaintiffs' Opposition (#138) at Exs. 27, 48.) A reasonable jury could therefore find that

25  Sylvestri's discipline was pretext. *See Liberty Lobby*, 477 U.S. at 248.

26

13

1    Finally, Venetian argues that Plaintiff Walker's termination was similarly justified by her

2  insubordination. On the same night that Plaintiff Walker had been saddled with two distant

3  stations, Plaintiff Walker got into an argument with the terminating supervisor over her workload.

4  (Plaintiffs' Opposition (#138) at Ex. 5, Vol. II, p. 29-36.) However, the supervisor who fired

5  Plaintiff Walker (a supervisor Venetian calls "disgruntled") has now changed her story: she claims

6  that Lydia instructed her to omit facts and term Plaintiff Walker's behavior "insubordination." (*Id.*

7  at Ex.5, Vol. II p. 34-35.) A jury should decide what is more credible: the initial or subsequent

8  explanation for Plaintiff Walker's termination. Furthermore, this same supervisor claims that Lydia

9  painted a target on Plaintiff Walker's back, requiring other Beverage Department managers to

10  report even normally unreportable misconduct. (*Id.* at Ex.5, Vol. II, p. 85:20-25.) In this

11  supervisor's view, Lydia made the request because "he wanted [Plaintiff Walker] gone." (*Id.* at Ex.

12  5, Vol. II, p. 85:16.) A reasonable jury could infer that this conduct was retaliatory, and therefore

13  summary judgment on Plaintiff Walker's retaliation claim is inappropriate.

14    **C.  Breach of Contract**

15    The basis for Plaintiffs' breach of contract claim is Venetian's breach of its promise to offer

16  only no-rotation schedules to its cocktail servers. The parties dispute whether Venetian promised

17  the following to Plaintiffs: "for so long as you stay [at the Venetian], you will not be subjected to a

18  rotation and will bid your stations based on performance rankings." (Plaintiffs' Reply (#150), p.

19  16:11-12.) Plaintiffs argue that Venetian made this promise at the beginning of their employment,

20  that this promise acted as an inducement for them to leave their previous jobs, that this promise was

21  (mostly) observed by Venetian, and that Venetian broke this promise in instituting the 2008

22  rotation schedule. For its part, Venetian denies making any such promise, insisting that Plaintiffs

23  were (or are) at-will employees.

24    However, despite the parties' skirmishing over Plaintiffs' at-will status, neither party denies

25  that Plaintiffs could lawfully be terminated "at any time and for any reason or no reason." *Martin v.*

26

14

1   *Sears, Roebuck & Co.*, 899 P.2d 551, 553 (Nev. 1995). This is the essence of at-will employment,

2   and neither Plaintiffs nor Venetian suggest that Venetian's no-rotation promise altered the

3   conditions under which Plaintiffs could be terminated. Rather, the parties dispute the contractual

4   status of the no-rotation policy as a "subsidiary agreement" to at-will employment–that is, an

5   "employment term." *See Baldonado v. Wynn Las Vegas, L.L.C.*, 194 P.3d 96, 106 n. 42 (Nev.

6   2008) (*citing Kauffman v. International Brotherhood of Teamsters*, 950 A.2d 44, 47-50

7   (D.C.App.2008) (discussing theories underlying modifications to at-will employment terms) and

8   *DiGiacinto v. Ameriko–Omserv Corp.*, 59 Cal. App. 4th 629, 634-39 (1997) (same)). Under

9   *Baldonado*, Nevada at-will employees "have no contractual rights arising from the employment

10  relationship that limit the employer's ability . . . to change the terms of employment." 194 P.2d at

11  106. And this is especially true where the employer has expressly reserved the right to alter at-will

12  employment terms. *Id.*

13          Nevada therefore adopts the approach taken by a majority of courts with respect to an

14  employer's ability to change the terms of at-will employment. *See Kaufmann*, 950 A.2d at 48

15  (collecting cases). The logic of this approach is that "the ability to terminate the employment

16  relationship at will necessarily includes the ability to alter its terms." *Id*; *see also DiGiacinto*, 59

17  Cal. App. 4th at 634. Where an employer unilaterally alters the terms of at-will employment, "the

18  employee's continued employment constitutes sufficient consideration for the modification."

19  *Baldonado*, 194 P.3d at 105. Otherwise, employers would be encouraged to fire at-will employees

20  and rehire them the following day under the changed terms. *Kaufmann*, 950 A.2d at 48.

21          Here, the undisputed evidence shows that Venetian's employee handbook–which Plaintiffs

22  acknowledge receiving–reserved the right "to change . . . policies and benefits, without prior notice,

23  as necessary." (Defendant's Opposition (#136), Ex. F.) The handbook furthermore specifies that

24  "[n]othing in this handbook is intended to create a contract of employment or benefits and no

25  statement made by any officer, supervisor, or team member can be construed as a binding guarantee

26

15

1    of employment. . . . Employment status may not be changed except if put in writing and signed by

2    an authorized officer of the Venetian." (*Id.* at Ex. G.) Notably, these provisions satisfy *Baldonado*'s

3    approved language for disclaimers that reserve an employer's right to change at-will employment

4    terms: "[The rights enumerated in the handbook do not] interfere in any way with the right of the

5    company to discharge or terminate you at any time." *Baldonado*, 194 P.3d at 106 n. 42 (citing

6    *D'Angelo*, 819 P.2d at 209 n. 4).

7         In addition, the Plaintiffs continued in their employment following the 2008 move to a

8    rotation schedule. Plaintiffs Walker and Vincent were terminated in 2010, Plaintiff Duncan was

9    terminated in 2011, and Plaintiff Mesh still works at the Venetian. (Defendant's MSJ (#109) at Ex.

10   A (Walker); Defendant's MSJ (#111) at Ex. AA (Vincent);  Defendant's MSJ (#111) at Ex. LL

11   (Duncan)t; Plaintiffs' Opposition (#137) at Ex. 40, p. 143-44 (Mesh).) This continued employment

12   constitutes "sufficient consideration" for the change to the rotation policy under a regime of at-will

13   employment. *Baldonado*, 194 P.3d at 105. That Plaintiffs protested the switch to a rotation

14   schedule is not legally relevant as long as they had a "brief period of time" to decide whether to

15   stay on or quit. *See Kaufmann*, 950 A.2d at 48 (cited approvingly by *Baldonado*, 194 P.3d at 105 n.

16   39). Here, Plaintiffs had several days. (*See* Plaintiff's MSJ (#107), Ex. 1 (noting that several days

17   elapsed between the announcement of the rotation schedule and its implementation).) Therefore,

18   Venetian did not breach any contract with Plaintiffs in the 2008 shift to a rotation schedule.

19        Plaintiffs lodge a number of other challenges to Venetian's control over at-will employment

20   terms, including estoppel and ratification.[8] Plaintiffs allege that the no-rotation policy induced them

21

22   _____

          [8] In light of this disposition of the breach of contract claim, the court need not consider
Plaintiffs' arguments that the handbook disclaimer did not effect a waiver of Plaintiffs' contracted-for
23   rights (there were none) and that the disclaimer was untimely (Plaintiffs were at-will employees even
     in the absence of the disclaimer, so the disclaimer's "timeliness" does not matter). For similar reasons,
24   the court need not address Plaintiffs' argument that the disclaimer was too vague to effectively
     disclaim. Finally, Plaintiffs' unconscionability arguments revolve around a different document–the
25   employment agreement–that does not address the terms of employment. Therefore, these arguments
26   are not relevant to the above analysis.

16

to leave lucrative jobs to come work at the Venetian, but this argument appears "merely to restate the breach of contract claim in other dress." *Kaufmann*, 950 A.2d at 49. In *Kaufmann*, for example, the plaintiff left his former job and began employment with the defendant employer, relying in part on the employer's offer to provide a housing stipend. *Id.* at 46. When his employer later discontinued the housing stipend, Kaufmann sued under a theory of estoppel. The court reasoned that Kaufmann's at-will status prevented him from "rel[ying] to his detriment" on a term his employer was free to modify with Kaufmann's consent–consent that Kaufmann impliedly gave when he continued his employment post-modification. *Id.* at 49.

Plaintiffs here are in a similar position to Kaufmann: they have not alleged reliance on a promise other than the one they impliedly agreed to modify. Thus, Plaintiffs have not shown that "injustice can be avoided only be enforcement of the promise"–that is, they have not made out a claim for estoppel. *See Dynalectric Co. of Nevada, Inc. v. Clark & Sullivan Constructors, Inc.*, 255 P.3d 286, 288 (Nev. 2011) (describing the elements of estoppel).

Finally, Plaintiffs allege that Venetian ratified the no-rotation policy, and therefore this policy became a contract between Plaintiffs and Venetian. "[C]ontract ratification is the adoption of a previously formed contract, notwithstanding a quality that rendered it relatively void." *Merrill v. DeMott*, 951 P.2d 1040, 1044 (Nev. 1997) (citation and quotation marks omitted). Here, Plaintiffs provide ample evidence that Venetian viewed itself as obligated to honor the no-rotation policy. (*See* Plaintiffs' MSJ (#107) at Exs. 6-11 (noting that several Venetian executives referred to the policy as an "agreement" with Plaintiffs.) However, this evidence falls short of demonstrating that Venetian "was relinquishing its right to change the terms" of at-will employment. *Baldonado*, 194 P.3d at 106.[9] As long as Venetian retained the power to terminate Plaintiffs at will–and neither

---

[9] Indeed, Venetian unilaterally changed those terms at least once. In 2002, Venetian transitioned from a performance-based station bidding system to a seniority-based station bidding system, contrary to the earlier policy that servers "bid . . . stations based on performance rankings." (Defendant's MSJ (#111), 18:20-22.)

1    party contests this–Venetian retained the lesser power to prospectively modify the terms of their

2    employment. *See DiGiacinto*, 59 Cal. App. 4th at 634 (cited approvingly by the *Baldonado* court,

3    194 P.3d at 105 n. 39.); *see also Cotter v. Desert Palace, Inc.*, 880 F.2d 1142, 1145 (9th Cir. 1989)

4    ("An employer privileged to terminate an employee at any time necessarily enjoys the lesser

5    privilege of imposing prospective changes in conditions of employment."). Therefore, Venetian's

6    attempts to honor its employment terms "did not, as a matter of law, [create] an enforceable

7    contract with respect to future periods of employment." *Baldonado*, 194 P.3d at 106.

8         Since Plaintiffs have not demonstrated that an enforceable no-rotation contract existed,

9    there is no "genuine issue of material fact" with respect to their breach of contract claim. Thus,

10   Plaintiffs cannot maintain their claim for the breach of the implied covenant of good faith and fair

11   dealing. *See Perry v. Jordan*, 900 P.2d 335, 338 (Nev. 1995) (noting that, to succeed on a claim for

12   breach of this covenant, the plaintiff must prove the existence of a contract).

13       **D. Negligent training and supervision**

14        Both Plaintiffs and Venetian have moved for summary judgment on Plaintiffs' negligent

15   training and supervision claim. The elements under Nevada law of a claim for negligent training

16   and supervision are "(1) a general duty on the employer to use reasonable care in the training and/or

17   supervision of employees to ensure that they are fit for their positions; (2) breach; (3) injury; and

18   (4) causation." *Reece v. Republic Services, Inc.*, 2011 WL 868386, *11 (D. Nev. Mar. 10, 2011).[10]

19

20       [10] The parties dispute whether physical harm is necessary to a claim of negligent training and

21   supervision, as do the opinions of this district. See *Robertson v. Wynn Las Vegas LLC*, 2:10-CV-00303-GMN, 2010 WL 3168239 *4-6 (D. Nev. Aug. 9, 2010) (collecting cases and certifying the

22   question to the Nevada Supreme Court (which could not rule because the case was dismissed)). The Nevada Supreme Court has not yet addressed the physical harm requirement, and "[i]n the absence of

23   conclusive authority, the court will not graft a physical injury requirement onto the tort of negligent . . . supervision." *Daisley v. Riggs Bank, N.A.*, 372 F. Supp. 2d 61, 81 (D.D.C. 2005) (collecting cases).

24   Notably, the majority approach (including California law, which is especially persuasive authority in Nevada) does not require physical harm. See Nesheba M. Kittling, *Negligent Hiring and Negligent*

25   *Retention: A State-by-State Analysis*, ABA 4th Annual Section of Labor and Employment Law

26   Conference (Nov. 6, 2010), *available at* http://abalel.omnibooksonline.com/ 2010/data/papers/087.pdf.

1    Claims for negligent training and supervision are based upon the premise that an employer should

2    be liable when it places an employee, who it knows or should have known behaves wrongfully, in a

3    position in which the employee can harm someone else. *Daisley v. Riggs Bank, N.A.*, 372 F. Supp.

4    2d 61, 79 (D.D.C. 2005). An employee's wrongful behavior does not in and of itself give rise to a

5    claim for negligent training and supervision. *Colquhoun v. BHC Montevista Hospital, Inc.*, 2010

6    WL 2346607, *3 (D. Nev. June 9, 2010). "Because the question of whether reasonable care was

7    exercised almost always involves factual inquiries, it is a matter that must generally be decided by a

8    jury." *Butler ex rel. Biller v. Bayer*, 168 P.3d 1055, 1065 (Nev. 2007).

9        Here, Plaintiffs' negligent training and supervision claims stem from Venetian's alleged

10   failure to act on Plaintiffs' discrimination complaints. (The parties do not dispute that Venetian

11   owed a duty to Plaintiffs not to discriminate against them.) In particular, Plaintiffs allege that Lydia

12   and Sylvestri were not "fit for their positions" because of their discriminatory conduct and that

13   Venetian failed to take proper action once it became aware of this conduct. (Plaintiffs' Reply

14   (#151), 4:25-26.) Venetian's Human Resources Department was apprised of Lydia's "fuck the

15   Founders" comments–made during meetings with Sylvestri–months before implementation of the

16   2008 rotation policy. (Plaintiffs' Opposition (#138) at Ex. 4, ¶ 9.) Venetian investigated, and Lydia

17   and Sylvestri denied making such comments. (Defendant's Reply (#144) at Ex. K, p. 43:23-44:5.)

18   Venetian took no further action.

19       By itself, this does not raise a genuine issue of material fact with respect to Plaintiffs'

20   negligent supervision claim. In light of subsequent complaints against Lydia and Sylvestri,

21   however, a reasonable jury could find that Venetian did not exercise reasonable care in supervising

22   them. First, Venetian's employee handbook sets forth a more extensive investigation procedure

23   than Venetian appears to have followed when looking into Plaintiffs' complaints.

24   The handbook explains that, upon receiving a discrimination complaint,

25           the person to whom the incident was reported must immediately (within 24 hours) notify
             the Human Resources Department. Thereafter, the Human Resource Department shall

26

promptly (within 24 hours) apprise the Legal Department of the allegation. An investigation of the conduct complained of will be conducted and appropriate action will be taken in response to the complaint. The investigation will be conducted . . . in as timely a fashion as is practical in light of all the surrounding circumstances, including, but not limited to, the business needs of the Venetian. The person making the complaint . . . will be notified of the outcome of the investigation.

(Plaintiffs' MSJ (#102), Ex. 3.) However, Plaintiff Walker claims that she was not informed of the outcome of any investigation into a later complaint accusing Sylvestri of retaliatory discipline, nor was an investigation undertaken. (Id. at Ex. 10.) Yet while Venetian does not deny failing to inform Plaintiff Walker of the outcome, Venetian has produced evidence that it gathered witness testimony regarding the incident. (Defendant's Opposition (#144) at Ex. N, M.) Second, Plaintiff Walker lodged other complaints–for example, complaints about the mistaken attribution of work absences–in which Lydia was implicated. (*See, e.g.*, Plaintiffs' MSJ (#102) at Ex. 14.) Taken together with Venetian's attempts to respond to these complaints, (*id*), there is a genuine issue of material fact as to whether Venetian exercised reasonable care in addressing Lydia and Sylvestri's alleged misconduct.

Similarly, in the context of what Venetian knew about Sylvestri and Lydia, Plaintiffs Duncan and Vincent have alleged claims of negligent supervision that raise genuine issues of material fact. First, Plaintiff Duncan complains that she was denied time off when younger servers with less seniority were not. (*Id.* at Ex. 15.) Lydia was involved in decisions to award time off, and Venetian was aware of Lydia's alleged discriminatory behavior. On the other hand, Venetian subsequently attempted to accommodate Plaintiff Duncan's requests for time off. (Defendant's Opposition (#144) at Ex. R, p. 79-80.) These facts give rise to competing reasonable inferences as to whether Venetian exercised reasonable care, and therefore summary judgment is inappropriate. Second, Plaintiff Vincent argues that Venetian discharged her in 2010 after a period of disability-induced leave because "Junior Managers did not want 'old' cocktail servers on the floor." (Plaintiffs' MSJ (#102) at Ex. 16.) Venetian provides evidence that it terminated Plaintiff Vincent so that she could pursue vocational rehabilitation. (Defendant's Opposition (#144) at Ex. S.) This

1    dispute is one of fact and should be resolved by a factfinder.

2              However, Plaintiff Mesh has not stated a successful claim for negligent training and

3    supervision. The only evidence Plaintiff Mesh cites to support her claim is an email complaining of

4    a change in her seniority. (Plaintiffs' MSJ (#102) at Ex. 12.) In that email, Plaintiff Mesh explicitly

5    distinguishes the treatment she received from the treatment other "Founders" received. Moreover,

6    Plaintiff Mesh has not alleged a claim involving Lydia or Sylvestri, failing to demonstrate that

7    either one was not "fit for [his] position." Since Plaintiff Mesh does not raise a genuine issue of

8    material fact with respect to Venetian's negligent training and supervision, summary judgment for

9    Venetian on Plaintiff Mesh's claim is appropriate.

10   **E. Negligent Infliction of Emotional Distress**

11             Plaintiffs allege a cause of action for negligent infliction of emotional distress against

12   Venetian. A claim of negligent infliction of emotional distress requires the plaintiff to show (1) the

13   defendant acted negligently, (2) "either a physical impact . . . or, in the absence of a physical

14   impact, proof of 'serious emotional distress' causing physical injury or illness," and (3) actual or

15   proximate causation. *See Barmetter v. Reno Air, Inc.*, 956 P.2d 1382, 1387 (Nev. 1998). "In order

16   to sustain a claim of emotional distress . . . the plaintiff needs to show that there was extreme and

17   outrageous conduct." *State v. Eighth Judicial District Court*, 42 P.3d 233, 241 (Nev. 2002).

18   "[E]xtreme and outrageous conduct is that which is outside all possible bounds of decency and is

19   regarded as utterly intolerable in a civilized community." *Maduike v. Agency Rent-A-Car*, 953 P.2d

20   24, 26 (1998) (internal quotation marks and citation omitted). "The Court determines whether the

21   defendant's conduct may be regarded as extreme and outrageous so as to permit recovery, but,

22   where reasonable people may differ, the jury determines whether the conduct was extreme and

23   outrageous enough to result in liability." *Chehade Refai v. Lazaro*, 614 F. Supp. 2d 1103, 1121 (D.

24   Nev. 2009) (*citing Norman v. Gen. Motors Corp.*, 628 F. Supp. 702, 704–05 (D. Nev. 1986)).

25             Notably, Plaintiffs have alleged this claim against Venetian and not against their immediate

26

antagonists, Venetian's employees. Therefore, Plaintiffs must argue that Venetian's negligence in "supervising and training its executives and managers to prohibit age discrimination" constitutes extreme and outrageous conduct. (Plaintiffs' Opposition (#137) at 33:1-2.) The alleged misconduct underlying this claim is the same misconduct that underlies Plaintiffs' negligent supervision claim: failing to exercise reasonable care in ensuring Lydia and Sylvestri were "fit for [their] position[s]." *Reece*, 2011 WL 868386 at *11.

As noted above, the factual predicates of Plaintiffs' negligent supervision claim include implementing the 2008 rotation schedule and failing to adequately investigate complaints of age discrimination. While there may be a question as to the motives behind the 2008 rotation, the implementation of the rotation itself is not conduct "beyond all bounds of human decency." Similarly, Venetian's failure to conduct vigorous internal investigations may raise questions about how carefully it supervised its employees, but this failure is not "extreme and outrageous" within the meaning of Nevada's emotional distress torts. *See Welder v. University of Southern Nevada*, 833 F. Supp. 2d 1240, 1245 (D. Nev. 2011) (noting that garden-variety "personnel management activit[ies]" do not constitute conduct "beyond all bounds of human decency"). Therefore, Venetian's Motion for Summary Judgment is granted as to the negligent infliction of emotional distress claim for all plaintiffs.

**F. ADA discrimination**

To prevail in an employment discrimination claim under the Americans with Disabilities Act, 42 U.S.C. §§ 12101-12213 (ADA), a plaintiff must establish that she (1) is an employee, (2) has a disability, (3) is a "qualified individual" capable of performing the essential functions of the job either with or without reasonable accommodation, and (4) was unlawfully discriminated against because of her disability. *See Kennedy v. Applause, Inc.*, 90 F.3d 1477, 1481 (9th Cir. 1996). The ADA defines "disability" in part as "being regarded as having [a physical or mental impairment]." *See* 42 U.S.C. 12102(1)(C). An individual is "regarded as" having a disabling impairment if she has

22

been subjected to unlawful discrimination because of it, "whether or not the impairment limits or is perceived to limit a major life activity." 42 U.S.C. § 12102(3)(A). A regarded-as impairment cannot be transitory and minor. 42 U.S.C. § 12102(3)(B). Nor is an employer obliged to provide reasonable accommodations to an employee only regarded as disabled. *See* 42 U.S.C. § 12201(h).

In 2008, Congress passed the ADA Amendments Act, Pub.L. No. 110-325, 122 Stat. 3553 (ADAAA), which rejected a narrow view of the regarded-as provision. In particular, Congress repudiated

> the Supreme Court's reasoning in [*Sutton v. United Airlines, Inc.*, 527 U.S. 471 (1999)] with regard to coverage under [§ 12102(1)(C)] and reinstat[ed] the reasoning of the Supreme Court in *School Board of Nassau County v. Arline*, 480 U.S. 273 (1980), which set forth a broad view of the third prong of the definition of handicap under the Rehabilitation Act of 1973.

"Introduction" Appendix to Part 1630, 29 C.F.R. § 1630, App. (2011). *School Board of Nassau County* reasoned that "the negative reactions of others are just as disabling as the actual impact of an impairment." 480 U.S. at 282. Thus, in passing the ADAAA, Congress eliminated the requirement that employees establish their employer's beliefs concerning the severity of their impairment. "Regarded as Substantially Limited in a Major Life Activity" Appendix to Part 1630, 29 C.F.R. § 1630, App. (2011).[11]

Here, because Plaintiff Vincent's ADA claim presumes that Venetian would be required to accommodate her, Plaintiff Vincent's claim must fail. Venetian argues that Plaintiff Vincent was

---

[11] Under the ADAAA, Plaintiff Vincent has successfully raised a genuine issue of material fact as to whether Venetian regarded her as disabled. Venetian argues that *Walton v. United States Marshals Service*, 492 F.3d 998 (9th Cir. 2007), requires Plaintiff Vincent to provide evidence of her imputed disability's severity, either through Venetian's subjective beliefs or through objective evidence. But the ADAAA has rejected this requirement. *See* 29 C.F.R. § 1630, App. (2011) (rejecting the reasoning of *Sutton*, on which *Walton* relies). Instead, Plaintiff Vincent must meet a lower standard: that Venetian regarded her as disabled. *Id.* Plaintiff Vincent has presented ample evidence that Venetian knew of her disability in the form of communications between Venetian and Plaintiff Vincent's physician. (Plaintiffs' Opposition (#133), Ex. 1.) Moreover, Venetian's employees exchanged emails discussing Plaintiff Vincent's inability to work. (Defendant's Reply (#156), Exs. A-H.) Therefore, a reasonable jury could conclude that Venetian regarded Plaintiff Vincent as disabled under the ADAAA's lower standard.

23

not qualified to perform her job as a cocktail server. Plaintiff Vincent does not disagree; instead, she counters that she was qualified to perform under an accommodated "reassignment." (Plaintiffs' Opposition (#133) at 15:12-13.) Under the ADAAA–as well as under Ninth Circuit precedent predating the ADAAA, *see Kaplan v. City of North Las Vegas*, 323 F.3d 1226, 1232 (9th Cir. 2003)–an employer has no duty to accommodate a regarded-as disability. See 42 U.S.C. § 12201(h). Since Plaintiff Vincent has not demonstrated that she was qualified for her job absent accommodation, she has failed to properly allege the elements of an ADA discrimination claim. Summary judgment on this claim is therefore proper. See Kaplan, 323 F.3d at 1233 (affirming summary judgment when the employee could not perform the essential functions of his job and the employer did not have a duty to accommodate him).

## IV.    Conclusion

For the foregoing reasons, the court concludes that summary judgment is appropriate on some, but not all, claims.

IT IS THEREFORE ORDERED that Defendant's Motion for Summary Judgment on Plaintiffs' ADEA disparate treatment claim (#109) is DENIED as to Plaintiffs Walker, Duncan, and Mesh. It is GRANTED as to Plaintiff Vincent. Defendant's Motion for Summary Judgment on Plaintiffs' ADEA disparate impact claim (#111) is GRANTED at to all plaintiffs.

IT IS FURTHER ORDERED that Defendant's Motion for Summary Judgment on Plaintiffs' ADEA retaliation claim (#109 and #111) is DENIED as to Plaintiff Walker. It is GRANTED as to Plaintiffs Vincent, Duncan, and Mesh.

IT IS FURTHER ORDERED that Defendant's Motion for Summary Judgment on Plaintiffs' breach of contract claim (#111) is GRANTED. Similarly, Defendant's Motion for Summary Judgment on Plaintiffs' breach of the implied covenant of good faith and fair dealing claim (#111) is GRANTED. Plaintiffs' Motion for Summary Judgment on the breach of contract claim and the breach of the implied covenant of good faith and fair dealing claim (#107) is hereby

1  DENIED.

2      IT IS FURTHER ORDERED that Defendant's Motion for Summary Judgment on

3  Plaintiff's negligent training and supervision claim (#111) is DENIED as to Plaintiffs Walker,

4  Vincent, and Duncan. It is GRANTED as to Plaintiff Mesh. Plaintiffs' Motion for Summary

5  Judgment on its negligent training and supervision claim (#102) is DENIED.

6      IT IS FURTHER ORDERED that Defendant's Motion for Summary Judgment on

7  Plaintiff's negligent infliction of emotional distress claim (#111) is GRANTED as to all plaintiffs.

8      IT IS FURTHER ORDERED that Defendant's Motion for Summary Judgment on

9  Plaintiff's ADA discrimination claim (#110) is GRANTED.

10     IT IS FURTHER ORDERED that the parties shall lodge their proposed joint pretrial order

11 within forty-five (45) days from entry of this Order. *See* Local Rule 16-4 and 26-1(e)(5).

12     IT IS SO ORDERED.

13     DATED this 9 day of October, 2012.

14

15

16     LARRY R. HICKS
       UNITED STATES DISTRICT JUDGE

17

18

19

20

21

22

23

24

25

26